**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

ROBERT W. SHAFFER,
GERALD W. ROBINSON,
WILLIAM BRICE SCHWEITZER,
WILLIAM BROWNING SCHWEITZER,
JEFF WALLACE,
CAROL HAWKINS,
DAVIS BELL,
CHRISTIAN RADA,
JAMES D. FOX,
JERRY A. FARMER,
STEVE E. FOX,
and BRADLEY A. FARMER,

      Plaintiffs,

vs.

INTERBANK FX, a division of Trade
Station Forex, Inc. and LUIS H. RIVAS,

      Defendants.

Civil Action No. _____
JURY DEMAND

**COMPLAINT**

    Robert W. Shaffer, Gerald W. Robinson, William Brice Schweitzer, William

Browning Schweitzer, Jeff Wallace, Carol Hawkins, Davis Bell, Christian Rada, James

D. Fox, Jerry A. Farmer, Steve E. Fox and Bradley A. Farmer ("Plaintiffs"), by and

through counsel, sue Defendants Interbank FX, a division of Trade Station Forex, Inc.

("Defendant Interbank FX" or "Defendants") and Luis H. Rivas ("Defendant Rivas" or

"Defendants") and allege:

**INTRODUCTION**

    1.    Plaintiffs were lured into transacting business with Defendants, buying and

selling foreign currencies in what is known as the foreign exchange ("Forex") market.

Defendants intended to, and did, systematically bilk them out of their account money through an elaborate scheme of false and misleading advertising, devices, and artifices. What were represented to Plaintiffs and others as a foreign currency trading platform developed upon professed principles of "fairness, honesty, and integrity," which was supposedly rooted in providing customers with a true market trading experience, totally devoid of dealer intervention and market manipulation, was in truth a platform predicated upon deceit and trickery that systematically looted the accounts of customers who, like Plaintiffs, placed their trust in Defendants.

2.     The scheme of Defendants was complex and varied, utilizing aggressive marketing and advertising campaigns, including internet, seminars, webinars, and other media, portraying Defendants as a foreign currency trading platform where investors could trade foreign currencies in a true market environment.   The advertisements were specifically targeted to convey a sense of trust and transparency to potential Defendants' customers and to gain the customers' confidence.   Defendant Interbank FX presented Defendant Rivas as one of their "reputable" traders and their trading platform for Forex trading.   To further bolster customers' confidence in its platform, Defendants enticed customers to use a practice or demo account (hereinafter, the "Demo Account") to simulate Defendants' trading experience.   The Demo Account, however, misled customers about the true nature, functionality, and performance of the platform.

3.     By trading through the "Demo Account" without being at financial risk, the customer was allowed to experience direct market pricing, free from Defendants' dealer interference or manipulation.   This enticed customers to open a "live" account and start trading with real money.

2

## JURISDICTION AND VENUE

4.     This action arises under the laws of the United States, in particular, the

Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961 et seq.

Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331, 18 U.S.C. § 1964, and 18 U.S.C. § 1961 et seq.

5.     This Court has supplemental jurisdiction over the state law claims

asserted herein pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the

federal claims in this action that they form part of the same case or controversy.

6.     This Court has further jurisdiction over the parties and the subject matter

of this class action pursuant to 28 U.S.C. § 1332(d) because: (a) there is diversity of

citizenship between at least one Plaintiff and Defendants; and (b) the amount in

controversy exceeds $5 million, exclusive of interest and costs.

7.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and U.S.C.

§ 1391(a) because a substantial part of the events and omissions giving rise to this

action occurred in the Eastern District of Tennessee and because Defendants

transacted business in this district.

## PARTIES

8.     All Plaintiffs are natural persons, and at all times relevant to this Complaint

resided or transacted business in the federal Eastern District of Tennessee and

elsewhere.

9.     Defendant Interbank FX, a division of Trade Station Forex, Inc. with

headquarters at 3165 East Millrock Drive, Suite 300, Salt Lake City, Utah   84121.

Defendant Interbank FX states it is a Futures Commission Merchant ("FCM") registered

with the Commodities Futures Trading Commission a member of the National Futures

3

Association ("NFA").   Defendant Interbank FX claims to have customers in over 135 countries.   Defendant Interbank FX offers individual traders, fund managers and institutional customers' proprietary technology and a "revolutionary approach" to foreign exchange trading.

10.     Defendant Luis H. Rivas has been known as Luis Hiram Rivas, Louis R. Rivas, Luis Hiram Rivas-Miranda, and Lou Rogers and is presently an inmate at the Federal Bureau of Prisons, Miami FCI, Registration No. 48463-004.   Defendant Rivas has a prior felony conviction for fraud and served ten years in South Carolina State Prison.   On November 19, 2009, Defendant Rivas was convicted in the United States District Court for the Eastern District of Tennessee in Chattanooga of felony wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. § 1957 and bankruptcy fraud in violation of 18 U.S.C. § 152(7).   This conviction is the result of the facts and circumstances arising out of the Complaint herein.

## FACTUAL BACKGROUND

11.     The Forex market is a worldwide, off-exchange financial market for the trading of currencies, which began in the 1970s and is currently the largest and most liquid financial market in the world.   The primary purpose of the foreign exchange market is to assist international trade and investment by allowing businesses and individuals to convert one currency to another currency.   To support these transactions, financial centers around the world function as anchors of trading between a wide range of different types of buyers and sellers.

12.     Forex trading functions much like the over-the-counter market for stocks. That is, Forex trades do not take place on a regulated exchange, and there is no central marketplace for buyers and sellers to clear their trades.   The primary participants in

4

Forex trades are large institutional investors who trade with each other in what is known as the inter-bank market. Within the inter-bank market, Forex trades are executed with narrow spreads, meaning that there is a negligible difference between the bid and ask prices.

13.     Investing in the foreign exchange market was initially within the exclusive purview of these large institutional investors such as pension funds, insurance companies, mutual funds, hedge funds, investment banks, and multinational corporations. However, over the past ten years or so, due to growth of the internet and online trading systems, it has become possible for individual investors to trade in the off-exchange foreign currency market. Individual investors can now do so by participating indirectly in the Forex market through a dealer counterparty, or retail broker, such as Defendants. Retail brokers are often referred to as "market makers" because they make their own market and fix the prices they offer to individual traders.

14.     Defendants aggressively promoted themselves and their products through internet, direct mail, seminars, webinars, and other advertising media, for the purpose of attracting individuals to sign up as customers, and for the purpose of inducing customers to actively trade foreign currencies using its electronic trading platform.

15.     To attract customers to open accounts and use its trading platform, Defendants employed an aggressive sales and marketing campaign touting their transparency, their speed of trade execution, and their fair business practices. This marketing campaign has spanned many years and continues to this day, and includes internet and direct mail advertising, as well as seminars, webinars, and other marketing media. In addition, Defendant Interbank FX used a wide network of "Introducing Brokers" (including Defendant Rivas), to refer customers to them for a fee or

5

commission, and have provided, and continue to provide, financial rewards to the various designers of their trading platform for directing customers to Defendants.

16. Also as a part of their aggressive sales and marketing strategy, Defendants offered the use of a "Demo," "Paper Trading," or "Practice" account (collectively referred to hereinafter as "Demo Account") whereby potential customers can try out Defendants' trading platform, purportedly simulating actual trading activity, but without risking real money. Defendants represented that the Demo Account would mirror actual trading conditions and would function as a training tool simulating real-world trading conditions.

17. Defendants further deceived customers by failing to disclose their dishonest practices in their disclaimers contained in Defendants' publications. Buried in the fine print of Defendants' lengthy, misleading, contradictory, and largely incoherent computer-generated publications, Defendants purport to innocuously "disclose" and "disclaim" to the customer that, at times, the Defendants *may* act as a "principal" in transactions, which *may* result in the customers not getting the "best price" on certain trades. In fact, Defendants acted as unscrupulous adversaries to their customers.

18. In connection with and knowledge of Defendant Interbank FX, Defendant Rivas established The Forex Project ("TFP") which was headquartered in Chattanooga, Tennessee with trading centers in Chattanooga, Tennessee, Knoxville, Tennessee, Spartanburg, South Carolina and elsewhere. Defendant Rivas represented himself as a trader in the foreign exchange market where his company goal was a fifteen percent (15%) monthly return on funds traded. Defendant Rivas took in $10,000 minimum deposits from customers and guaranteed a five (5%) monthly return. For this minimum monthly deposit of $10,000, customers would sign a three (3) year promissory note with

6

Defendant Rivas guaranteeing a five percent (5%) monthly return. At the end of the three (3) year period, customers would receive the initial deposit back in full. Defendant Rivas's goal was to make fifteen percent (15%) to twenty-five percent (25%) on all funds traded in the foreign exchange. From that return, Defendant Rivas would pay the customer five percent (5%), an equity agent who brought the customer to TFP, two percent (2%), trader doing the trading, three percent (3%) and the remainder to Defendant Rivas for administrative costs and profit. Defendant Rivas promised the five percent (5%) return beginning two (2) months after the initial investment.

19. Defendant Rivas had customers open accounts with Defendant Interbank FX and then wire transferred funds into the account. Defendant Rivas' trading system was designed around the Meta Trader 4 trading platform provided by Defendant Interbank FX. The customers were never given other trading platforms or foreign currency trading company options. The customer would be required to execute a power of attorney to permit Defendant Rivas to trade their account in the foreign currency exchange market. Defendant Rivas held training seminars for prospective customers interested in trading on the foreign currency exchange market. Defendant Rivas employed equity agents as a means of attracting new customers to his program. The equity agents were two percent (2%) monthly for all investor funds into TFP. Defendant Rivas claimed approximately 222 customers with a total of $25,000,000 being held in fifteen (15) different accounts maintained by Defendant Interbank FX at its location in Salt Lake City, Utah. Any equity check payments to customers made by Defendant Rivas came from profits he earned by his trading of Defendant Interbank FX's accounts.

20.    Defendant Rivas' foreign currency market trading accounts maintained by Defendant Interbank FX indicated the following.   On March 8, 2008, Defendant had sixteen (16) accounts containing approximately $4,477,000.   On April 25, 2008, Defendant Rivas had fourteen (14) accounts containing approximately $5,383,000.   On May 16, 2008, Defendant Rivas had thirteen (13) accounts containing a greatly diminished amount of approximately $11,900.   Between April 25 and May 16, 2008, Defendant Rivas withdrew approximately $3,427,000 by way if wire transfers.   In making these withdrawals, in this period, Defendant Rivas lost over $2.5 million in what would have been open trades on the foreign currency exchange market.

21.    From January 2007 Defendant Rivas deposited approximately $3,968,000 into his trading accounts held at Defendant Interbank FX.   In fact, Defendant Rivas never had the ability to return the promised five percent (5%) monthly to 222 customers whom he claimed invested $25,000,000 in TFP.   The $25,000,000 investment would have required a monthly payment of $1,250,000 to the customers and a monthly payment of $500,000 to equity agents.   At the end of three (3) years, Defendant Rivas promised a full return of each client's investment.   Defendant Rivas's total profits of $3,304,000 from January 2007 to May 16, 2008 could not have supported his promised payments of approximately $1,750,000 per month.   Defendant Rivas had no ability to return the investors' estimated $25,000,000 at the end of their respective three (3) year terms.

22.    Defendant Rivas' seminars which were regularly attended by approximately fifty (50) potential customers and numerous TFP employees regularly portrayed Defendant Rivas as representing having thirty (30) years of trading experience in the foreign currency market.   On the last day of the seminars, Defendant

8

Rivas directed everyone to the TFP website which had a direct link to Defendant Interbank FX's account setup.

23.     Defendant Rivas' false representations were promoted and given credibility by Defendant Interbank FX in its extensive media advertising campaign which presented Defendant Rivas as a "forex trader" searching for a "reputable online broker." Defendant Interbank FX described Defendant Rivas as "discovering" Defendant Interbank FX and being impressed by "the genuine customer service attitude and the company's unique approach to forex trading."

24.     In early May 2008, equity agents realized that TFP's customer's equity checks began bouncing.   Defendant Rivas made representations of his "financial problems" and the need for time to "trade out of his situation."   Defendant Rivas promised to refund their money but at eighty percent (80%) of the initial investment. These suspicious were confirmed on May 15, 2008 when four TFP investors filed an involuntary bankruptcy petition against Defendant Rivas in the United States Bankruptcy Court, Chattanooga, Tennessee.   Thereafter, Plaintiffs discovered the nature and extent of Defendants' racketeering schemes.

## COUNT I

## CIVIL RICO: 18 U.S.C. § 1962(c)

25.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 24 as if fully set forth herein.

26.     This cause of action asserts claims against Defendants for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "Defendants' Fraud Enterprise" described herein, through the "pattern of racketeering activity" described herein.

9

27.     Defendants and Plaintiffs are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

28.     During the relevant period, Plaintiffs were and are each a "person injured in his or her business or property by reason of a violation of' RICO within the meaning of 18 U.S.C. § 1964(e).

29.     During the relevant period, Defendants were, and are, "persons" who conducted the affairs of the "Defendants' Fraud Enterprise" described below, through the "pattern of racketeering activity" described below.   While Defendants participate in the Defendants' Fraud Enterprise, it has an existence separate and distinct from the enterprise. Further, the Defendants' Fraud Enterprise is separate and distinct from the "pattern of racketeering activity" in which Defendants have engaged and are engaging.

30.     During the relevant period, Defendant were associated with, operated or controlled, the Defendants' Fraud Enterprise, and Defendants participated in the operation and management of the affairs of the Defendants' Fraud Enterprise, through a variety of actions described herein.   Defendants' participation in the Defendants' Fraud Enterprise is necessary for the successful operation of Defendant's scheme.

## A.  The Defendants' Fraud Enterprise

31.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

32.     Defendant Interbank FX and Defendant Rivas are the persons, and others presently unknown, being members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "Defendants' Fraud Enterprise:"

10

33.     The "Defendants' Fraud Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.   The Defendants' Fraud Enterprise is an organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendant has engaged and is engaging.   The Defendants' Fraud Enterprise was used as a tool to effectuate the pattern of racketeering activity.

34.     Defendant Interbank FX used the services of Introducing Brokers, one of whom was Defendant Rivas, who were paid commissions or fees, to steer customers to Defendants' trading platform in furthering the ends of the Defendants' Fraud Enterprise. The Introducing Brokers assisted in the perpetuation of the goals of the Defendants' Fraud Enterprise by bringing additional customers to Defendant.   These Introducing Brokers also assisted in perpetuating the goals of the Defendants' Fraud Enterprise by predictability passing on and repeating the various fraudulent statements of Defendants and bolstering the believability of the Defendant's false statements.

35.     The Defendant' Fraud Enterprise engaged in and affected interstate commerce by, among other things, marketing, advertising, selling, or providing a Forex trading platform to thousands, if not hundreds of thousands, of entities and individuals throughout the United States, as described herein. The Defendants' Fraud Enterprise began by at least January 2006.

36.     The overarching purpose of the Defendants' Fraud Enterprise was for each of its members to profit from customers' opening Live Accounts with Defendant

Interbank FX. Defendant Interbank FX accomplished this goal by paying Defendant

Rivas a commission for all the customers who designated him as their introducing

broker, and then, defrauding and manipulating customers, stealing money from those

customers, by accepting funds for foreign currency trading and misappropriating those

funds, or the proceeds derived therefrom, through the dishonest trade execution

practices described in this Complaint.

### B.  Predicate Acts (Wire Fraud)

37.    Section 1961(1) of RICO provides that "racketeering activity" is, among

other things, any act indictable under any of the provisions of 18 U.S.C. § 1343 (wire

fraud).

38.    Beginning as early as March 2007 and continuing to at least May 16,

2008, Defendant Interbank FX representing itself as a reputable customer service

oriented brokerage firm and Defendant Rivas representing himself as an experienced

foreign currency exchange trader, established seminars through print and electronic

advertising media promising investors unrealistically high returns on their investments

well knowing that Defendants could not guarantee such returns.   Many victims were

promised sixty percent (60%) to ninety percent (90%) annual returns on their

investments, paid in monthly increments.   These promises were actually put in writing

as investors were given promissory notes.   Defendants also enlisted the help of many

investors who were told they would receive a two percent (2%) return on investments

made by people they recruited.   These individuals were referred to as equity traders.

39.    The Defendants successfully defrauded over 300 individuals in various

states including the Eastern District of Tennessee, South Carolina and elsewhere in

excess of $18,000,000 and at least $5,000,000 as to Plaintiffs.   Early investors

received monthly payments made from the investments of newer investors, making this is a classic "Ponzi scheme." Much of the investors' money was never invested but instead was used to purchase luxury items for the Defendants.

40. As set forth below, to carry out, or attempt to carry its scheme to defraud, Defendants have engaged in the affairs of the Defendants' Fraud Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

(a) On December 7, 2007, Defendant Rivas caused a wire transfer of $100,000 proceeds from the First National Bank of Spartanburg account, in Spartanburg, South Carolina to Defendant Rivas's account at First Tennessee Bank, located in Chattanooga, Tennessee where Defendant Rivas has his base of operations and for the purpose of making those funds more accessible to the Defendant Rivas.

(b) On December 19, 2007, Defendant Rivas caused a wire transfer of $53,976.90 of the scheme's proceeds from the First National Bank of Spartanburg, Spartanburg, South Carolina to an account at the First Volunteer Bank, located in Chattanooga, Tennessee to enable Defendant Rivas's employee to purchase a vehicle and thereby reward that employee.

(c) On April 24, 2008, Defendant Rivas while in Chattanooga electronically caused a wire transfer of $170,000 of the scheme's proceeds from Defendant Interbank FX in Salt Lake City, Utah to the Defendant's Bank of America account, Chattanooga,

Tennessee to facilitate Defendant Rivas's access to the funds and further the scheme.

(d) On May 7, 2008, Defendant Rivas while in Chattanooga electronically caused a wire transfer of $670,000 of the scheme's proceeds from Defendant Interbank FX in Salt Lake City, Utah to the Defendant's Bank of America account, Chattanooga, Tennessee to facilitate Defendant Rivas's access to the funds and further the scheme.

41. Defendants' misrepresentations and acts were knowing and intentional, and made with the intent to create and manage its scheme to defraud and manipulate customers by accepting funds for foreign currency trading and misappropriating or manipulating the amounts traded, as described in the Complaint.

42. Plaintiffs reasonably relied on Defendants' false statements by continuing to invest money with Defendants and not taking immediate action to close their accounts and demand the return of their investments.

43. As described below, Defendants' violations of these statutes constitute a "pattern of racketeering activity" because such predicate acts were related to each other in that they were committed as part of an illegal and fraudulent marketing scheme, and an illegal and fraudulent scheme to defraud and steal money from customers by accepting investments for foreign currency futures trading and misappropriating or manipulating the amounts invested, all of which amount to or pose a threat of continued criminal activity.

44.     As a direct and proximate result of Defendants' illegal conduct in violation of 18 U.S.C. § 1962(e), Plaintiffs have been injured in their business or property by the following acts, which include, but are not limited to:

(a)     The theft and loss of the amounts Plaintiffs invested with Defendants in an amount that will be proven at trial; and

(b)     The consequential damages relating to not receiving the investment return that Plaintiffs could have obtained from prudent investments in an amount that will be proven at trial.

## C. The Pattern of Racketeering Activity

45.     As set forth herein, Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past 10 years.

46.     Defendant have engaged in a scheme to defraud consumers, including Plaintiffs, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in their marketing materials, on their website, and in other advertisements, with the use of United States mail or interstate telecommunication systems for the purpose of executing its scheme

47.     Defendants' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiffs.

48.     Defendants' scheme to defraud was made with intent to induce reliance by Plaintiffs upon such misrepresentations, concealments, suppressions, or omissions.

49.     Defendants' scheme to defraud was made with the purpose of gaining hundreds of millions, and potentially billions, of dollars in profits from customers,

including Plaintiffs, that would not have been gained but for Defendant's acts and omissions alleged herein.

50.     As detailed below, Defendants' fraudulent scheme and conspiracy consisted of, among other things:

(a)     The unlawful promoting and marketing of materials and advertisements containing false information, including, but not limited to, the Demo Account and Live Accounts described in this Complaint, upon which Defendants used to manipulate and induce reliance on customers, thereby engaging in unethical and illegal behavior to gain profits from its customers;

(b)     Embarking on an aggressive sales and marketing campaign, through television, internet, seminars, the Demo Account and Live Account described in this Complaint, and other advertising media, through which Defendants misrepresented that an average person, without any particular training or expertise, could experience and enjoy substantial profit and financial gain by trading foreign currencies using Defendant Interbank FX's trading platform when, in actuality, unlike Live Accounts, the Demo Accounts are not subjected to intervention and market manipulation by the Defendant, and Live Accounts are subjected to the dishonest practices described in this Complaint; and

(c)     Embarking on an aggressive sales and marketing campaign, through internet, seminars, and promotion of the Demo Account and thereafter Live Accounts, described in the Complaint, and other

16

advertising media, for the purpose of inducing new and existing customers to actively trade foreign currencies on Defendants' deceptive trading platform so Defendant could employ the dishonest practices described in the Complaint.

51.     The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiffs.   Each such racketeering activity is related, has a similar purpose, involves the same or similar participants and methods of commission, and has similar results affecting similar victims, including Plaintiffs. These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

52.     Many of the precise dates and times of Defendants' violations of the above-referenced statutes are not known. Indeed, an essential part of the successful operation of the illegal sales and marketing scheme alleged herein depended upon secrecy and Defendants took deliberate steps to conceal its wrongdoing.   However, given the massive scope of the illegal and fraudulent scheme, Defendants likely committed thousands, if not millions, of predicate acts of "racketeering activity."

53.     Defendants' violations of the above laws, and the effects thereof detailed above, are continuing and will continue.   Plaintiffs are and continue to be injured in their property by reason of these violations in that Plaintiffs traded on Defendants' Forex trading platform, which trades would not have been made had Defendants not conspired to violate 18 U.S.C. § 1962(e).

54.     Plaintiffs' injuries are directly and proximately caused by Defendants' racketeering activity as described herein.

55. Plaintiffs have standing to sue Defendants under 18 U.S.C. § 1964(c) and to recover compensatory damages, treble damages, and the costs of suit, including reasonable attorneys' fees.

56. In addition, Plaintiffs are entitled to declaratory and injunctive relict pursuant to 18 U.S.C. § 1964(a), to remedy and prevent Defendants from engaging in further violations of Federal law.

57. Upon information and belief, there have been numerous other predicate acts by Defendants that are presently unknown to Plaintiffs.

## COUNT II

## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
## TENN. CODE ANN. § 47-18-101, et seq.

58. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

59. As described herein, Defendants have engaged in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiffs.

60. Defendants have concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and caused others to misrepresent, information about its market and account manipulation during Live Trading.

61. Defendants' deceptive acts and practices are of a recurring nature directed at consumers.

62. Defendants' deceptive acts and practices have a broad, uniform impact on consumers at large.

63. Defendants' deceptive acts and practices are materially deceptive and misleading.

18

64.    Plaintiffs have been injured, and are continuing to be injured, as a direct and proximate result of Defendants' deceptive acts and practices.

## COUNT III

### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
### TENN. CODE ANN. § 47-18-101, et seq.

65.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

66.    As described herein, Defendants have engaged, and continue to engage, in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiffs.

67.    Defendants have engaged, and continue to engage, in the above-described uniform deceptive national advertising and marketing program, including widespread advertising campaigns, promotions, seminars, press releases, "consumer-oriented" statements and advertising within its website, including by use of the Demo Account described herein.

68.    Plaintiffs reasonably relied, and continue to reasonably rely, upon the skill and judgment of Defendants, its agents, servants, and employees, and the representations and claims made by Defendants in its uniform deceptive national advertising and marketing campaigns and its representations made during live trading.

69.    Defendants' deceptive acts and practices arc of a recurring nature and are directed at consumers.

70.    Defendants' deceptive acts and practices have a broad, uniform impact on consumers at large.

71.     Defendants' deceptive acts and practices are materially deceptive and misleading.

72.     Plaintiffs have been, and continue to be, injured as a direct and proximate result of Defendants' deceptive acts, practices and advertisements.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, Robert W. Shaffer, Gerald W. Robinson, William Brice Schweitzer, William Browning Schweitzer, Jeff Wallace, Carol Hawkins, Davis Bell, Christian Rada, James D. Fox, Jerry A. Farmer, Steve E. Fox and Bradley A. Farmer, on behalf of themselves and all others similarly situated, prays for judgment and relief on all Counts against Defendants Interbank FX and Luis H. Rivas, as follows:

1.     That judgment be entered against Defendants for compensatory damages, including treble damages for Civil RICO as provided by 18 U.S.C. § 1964(c) and the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq.;

2.     That money damages of at not less than $5,000,000 and treble damages as applicable in accordance with the above stated statutes as to Plaintiffs;

3.     That reasonable attorney's fees be awarded;

4.     That costs of this litigation be awarded; and

5.     That such other and further relief as the Court may deem necessary or appropriate be ordered.

Respectfully submitted this 14th day of May, 2012.

BERNSTEIN, STAIR & MCADAMS LLP


By:    *s/ HUGH B. WARD, JR.*
       HUGH B. WARD, JR. (BPR #015071)
       ATTORNEYS FOR PLAINTIFFS

BERNSTEIN, STAIR & MCADAMS, LLP
THE TRUST COMPANY BUILDING
4823 OLD KINGSTON PIKE SUITE 300
KNOXVILLE, TENNESSEE   37919
(865) 546-8030